# EXHIBIT G

Case 1:04-cv-11450-RGS    Document 22-8    Filed 08/11/2005    Page 1 of 15

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS
NO. 04-11450-RGS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CRYSTAL MOTOR EXPRESS, INC.,
    Plaintiff

vs.

TOWN OF LYNNFIELD,
    Defendant

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    DEPOSITION OF WILLIAM GUSTUS, a witness called on Behalf of the Plaintiff, pursuant to Massachusetts Rules of Civil Procedure, before Diane M. Durette, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Looney & Grossman, 101 Arch Street, Boston, Massachusetts on Wednesday, July 27, 2005, commencing at 10:20 a.m.

ORIGINAL

G&M Court Reporters, Ltd.
617-338-0030

1  Q.  Had you ever had conversations with anyone
2      else in that group?
3  A.  No, not to my recollection.
4  Q.  Do you have any knowledge concerning the
5      proceedings before the Lynnfield
6      conservation commission with regard to the
7      Crystal site?
8  A.  No.
9  Q.  Are you aware of whether the town ever
10     considered a diesel fuel bylaw prior to Mr.
11     LaGreca introducing the idea to the town?
12 A.  I'm not aware.
13 Q.  How about diesel fuel regulations?
14 A.  I'm not aware.
15 Q.  Did Mr. LaGreca or anyone else ever show you
16     a proposed bylaw for diesel fuel burning?
17          MR. CLOHERTY:  At any time?
18          MR. COLBERT:  At any time.
19 A.  Yes.
20 Q.  When was that?
21 A.  I don't recall specifically.  Sometime
22     during the summer of 2003.
23 Q.  What did you do with it when you received
24     it?

```
 1   A.   I read it.
 2   Q.   Anything else?
 3   A.   I may have passed it on.  I think I passed
 4        it on to town counsel.
 5   Q.   Was town counsel Tom Mullen at that time?
 6   A.   Yes, it was.
 7   Q.   Did you have any conversations with Tom
 8        Mullen about the proposal that was given to
 9        you?
10             MR. CLOHERTY:  Yes or no answer,
11        please.
12   A.   Yes.
13   Q.   What were those conversations?
14             MR. CLOHERTY:  Objection, I
15        instruct the witness not to answer.
16             MR. COLBERT:  I just repeat --
17             MR. CLOHERTY:  Certainly.
18             MR. COLBERT:  -- our opposition to
19        your objection.
20   Q.   How many conversations did you have with Tom
21        Mullen about the proposed diesel fuel bylaw?
22             MR. CLOHERTY:  You can answer.
23   A.   I don't recall.  It was probably more than
24        one, but I can't tell you how many.
```

1  Q.  More than three?

2  A.  No. Several, two, three. I don't know.

3  Q.  But not more than three or maybe more than

4      three?

5  A.  Ever or up to that point?

6  Q.  Up to that point.

7  A.  Less than three.

8  Q.  How about ever?

9          MR. CLOHERTY: Since the initiation

10     of this litigation?

11         MR. COLBERT: Yes.

12 A.  Many.

13 Q.  Up to the filing of the litigation though?

14 A.  Yes.

15 Q.  What, three?

16 A.  No.

17 Q.  Many?

18 A.  Many.

19         MR. COLBERT: John, you're going to

20     object to my asking about the subject of

21     those conversations, each and every one of

22     them; is that right?

23         MR. CLOHERTY: Yes, I will unless

24     you can establish some other foundation that

```
 1      they are not privileged.  For instance, I'm
 2      not going to tell you how to direct your
 3      questioning but there's been a statement
 4      made on the record at a public meeting I'm
 5      sure where there was conversations that took
 6      place in public.  Those would not be
 7      privileged.  So I'm not going to instruct
 8      the witness not to answer as to those
 9      conversations.
10   Q. As to the conversations you had with
11      Attorney Mullen, was there anyone else
12      around that took part in those
13      conversations?
14   A. No.
15   Q. Were any of them in a public meeting?
16   A. Yes.
17   Q. Which ones?
18           MR. CLOHERTY:  Which public
19      meetings?  You're not asking the contents of
20      his discussions, right?
21           MR. COLBERT:  I'm asking which
22      public meetings?
23   A. There was a Selectmen's meeting that was
24      held immediately preceding the town meeting
```

| | | |
|---|---|---|
| 1 | | on October 20, 2003. |
| 2 | Q. | Any other public meetings where |
| 3 | | conversations took place with Attorney |
| 4 | | Mullen about this diesel fuel bylaw? |
| 5 | A. | Not that I recall. |
| 6 | Q. | Did Attorney Mullen speak at the town |
| 7 | | meeting in November of 2003 concerning |
| 8 | | diesel fuel bylaw? |
| 9 | A. | The meeting was in October but yes, he did. |
| 10 | Q. | Could you tell me what he said, please? |
| 11 | A. | He said that he had several concerns related |
| 12 | | to the proposed bylaw.  His main concerns |
| 13 | | were possible federal preemption which he |
| 14 | | somewhat discounted and thought that the |
| 15 | | town could prevail on the preemption |
| 16 | | argument and that he was concerned about |
| 17 | | this bylaw as it may be applied to Crystal |
| 18 | | Motors. |
| 19 | Q. | Did he say anything else? |
| 20 | A. | He was very careful in his discourse at the |
| 21 | | town meeting, at one point stating that he |
| 22 | | had some concerns, he was concerned about |
| 23 | | potential litigation.  He implied that he |
| 24 | | had spoken to counsel for Crystal prior to |

1    the town meeting, and he was fairly

2    confident, and I'm paraphrasing, that

3    litigation would result if this bylaw were

4    passed, although he had, quote, not seen the

5    complaint, quote. He claimed, he said that

6    he was somewhat concerned about whether this

7    could be considered some sort of a

8    regulatory taking.

9  Q.  Did he explain what regulatory taking meant?

10  A.  I don't recall whether he explained that at

11    the town meeting.

12  Q.  Is this town meeting on a videotape

13    cassette?

14  A.  It is.

15        MR. COLBERT: I had asked for that

16  the other day, John.

17        MR. CLOHERTY: I've already made my

18  request to my client. When we get it, we'll

19  provide it, Counsel.

20  Q.  Did you speak at the town meeting on the

21    diesel fuel bylaw?

22  A.  I did not.

23  Q.  Did any of the Board of Selectmen speak?

24  A.  Yes.

1  Q. Which ones and what did they say?
2  A. The chairman of the board, Bob Whalen spoke
3     and expressed on the one hand he thought
4     that there were, there was some merit to
5     these kinds of regulations but he felt -- he
6     didn't feel, he stated that based upon the
7     great potential for litigation that the
8     article should be indefinitely postponed.
9  Q. Did any other selectmen speak on the
10    article?
11 A. No.
12 Q. Is he a lawyer?
13 A. No.
14 Q. Any other town officials speak at that town
15    meeting?
16 A. Yes.
17 Q. Who?
18        MR. CLOHERTY: Just on the
19    article?
20        MR. COLBERT: On the article, yes.
21 A. The chairman of the planning board spoke on
22    behalf of the planning board on all articles
23    related to bylaws, the planning board must
24    make a recommendation.

1  Q.  What is his name and what did he say with
2      regard to the diesel fuel bylaw?
3  A.  His name is Richard O'Neill and his comments
4      pretty much mirrored that of the chairman of
5      the Board of Selectmen that there was a
6      great potential for litigation, and he
7      reported that the planning board had voted
8      to recommend indefinite postponement on the
9      article.  Dr. Peinert spoke on behalf of the
10     Board of Health.
11 Q.  When the planning board member spoke, did he
12     mention Crystal Motors?
13 A.  I don't recall whether he specifically
14     mentioned them.
15 Q.  Did you agree with the statements of town
16     counsel at the town meeting?
17            MR. CLOHERTY:  Objection.
18 A.  I don't know that I agreed with him or
19     disagreed with him.  I understood his
20     concerns.
21 Q.  Why did you understand his concerns?
22            MR. CLOHERTY:  Objection.
23 A.  Because he explained them in a way that I
24     could understand.  I looked at the bylaw, he

1  told me what his concerns were and I could
2  look at the bylaw and listen to what he told
3  me and say okay, I understand.
4  Q. As the town administrator and also as a
5     lawyer, did you share any of his concerns?
6           MR. CLOHERTY: Objection.
7  A. Yes.
8  Q. Were any studies presented at the town
9     meeting that linked diesel fuel burning at
10    the Crystal site to potential adverse health
11    effects that could be caused to town
12    residents?
13          MR. CLOHERTY: Objection.
14 A. No study that was done specifically of that
15    site and those residents was presented.
16    There were general studies that were
17    mentioned.
18 Q. How about studies relating to any other
19    diesel burning site in the town of Lynnfield
20    and the potential adverse health effects
21    that could be caused to Lynnfield residents,
22    were any of those presented at the town
23    meeting?
24 A. Not that I recall.

1   Q.   Would there be a record of those maintained
2        by the town somewhere if they had been
3        presented?
4   A.   Yes.
5   Q.   Where would that be maintained?
6   A.   The town clerk.  If anything was presented
7        at the town meeting and handed to the
8        moderator it should be in the town clerk's
9        files.
10              MR. COLBERT:  I'm going to request
11       the town clerk's file on this town meeting
12       as well.
13              MR. CLOHERTY:  Certainly.  I don't
14       think that's been part of any prior request
15       so if you want to just put that in a letter,
16       cover letter to me, we'll follow-up.
17              MR. COLBERT:  Okay, thanks.
18  Q.   Are you aware of any other town that has a
19       diesel fuel burning bylaw in Massachusetts?
20  A.   I'm not aware.
21  Q.   Have you ever inquired into whether any
22       other town has such a bylaw?
23  A.   No.
24  Q.   Do you have a view as to whether state laws

1   concerning diesel fuel are adequate?
2         MR. CLOHERTY: Objection.
3   A.  No.
4   Q.  Do you have a view as to whether federal
5       laws regarding diesel fuel are adequate?
6         MR. CLOHERTY: Objection.
7   A.  No. I don't have enough, I don't know about
8       those regulations and laws. There's no way
9       I could know.
10  Q.  Other than public meetings you referenced
11      with regard to Attorney Mullen, were there
12      any Board of Selectmen meetings where
13      Attorney Mullen made statements about the
14      diesel fuel bylaw?
15  A.  Not that I recall.
16  Q.  Any other town departments where Attorney
17      Mullen made such statements at their
18      meetings?
19  A.  I don't know.
20  Q.  How about executive sessions of meetings of
21      the Board of Selectmen, did Attorney Mullen
22      ever attend meetings and discuss the diesel
23      fuel bylaw during any executive session?
24        MR. CLOHERTY: Objection. You can

1   answer yes or no.
2   A. I don't -- I don't believe so.
3   Q. How about any other meetings that were not
4      open to the public that Attorney Mullen had
5      with you, were there any conversations about
6      the diesel fuel bylaw?
7            MR. CLOHERTY: Objection. Yes or
8      no, please.
9   A. Meetings?
10  Q. Yes.
11  A. I don't believe so.
12  Q. So other than telephone calls there were no
13     face-to-face meetings with Attorney Mullen
14     concerning the diesel fuel bylaw that you
15     had?
16           MR. CLOHERTY: Objection. Yes or
17     no, please.
18  A. Not that I recall.
19  Q. Do you know whether any other town official
20     had conversations with Attorney Mullen that
21     were not part of the public meeting
22     concerning the diesel fuel bylaw?
23  A. I don't know.
24  Q. You are aware that the diesel fuel bylaw

```
 1       contains a provision that prohibits the
 2       location of a diesel burning site within
 3       1,000 feet of a residential area; is that
 4       right?
 5   A.  Yes.
 6   Q.  Do you have any understanding as to the
 7       basis for the 1,000 foot setback?
 8   A.  No.
 9   Q.  Did you ever discuss that with anyone?
10   A.  Yes.
11   Q.  Who?
12   A.  Town counsel.
13   Q.  What did you say?
14           MR. CLOHERTY:  Objection.  Don't
15       answer that.
16           MR. COLBERT:  We'll repeat our
17       opposition to the objection.
18   Q.  Anyone else other than town counsel?
19   A.  Not that I recall.
20   Q.  How about any other provision of the diesel
21       fuel bylaw, did you have conversation with
22       anyone regarding concerns about specific
23       provisions?
24   A.  Yes.
```